## STATE OF CONNECTICUT v. CARLOS ASHE
### (AC 22784)

Schaller, West and Dupont, Js.

Argued September 18, 2002—officially released January 14, 2003

*William B. Westcott*, special public defender, for the appellant (defendant).

*Robert J. Scheinblum*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *James G. Clark*, senior assistant state's attorney, for the appellee (state).

*Opinion*

SCHALLER, J. The defendant, Carlos Ashe, appeals from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes §§ 53a-54a (a)[1] and 53a-8 (a),[2] conspiracy to commit murder in violation of General Statutes §§ 53a-54a (a) and 53a-48 (a),[3] and two counts of assault in the first degree in violation of General Statutes §§ 53a-59 (a) (5)[4] and 53a-

---

[1] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . ."

[2] General Statutes § 53a-8 (a) provides: "A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

[3] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

[4] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when . . . (5) with intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of the discharge of a firearm."

8 (a). The defendant claims (1) that the evidence was insufficient to sustain his conviction of murder and assault in the first degree, and (2) that the prosecutor committed misconduct in closing argument. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On December 14, 1996, at approximately 2 a.m., Sean Adams, Darcus Henry, Johnny Johnson and the defendant, all of whom were members of a gang known as the Island Brothers, went to a housing project (project) in New Haven. All four were armed, and as they entered a courtyard in the project, they fired on the three victims, Andre Clark, Marvin Ogman and Jason Smith. Smith died, and Clark and Ogman were seriously injured as a result of the attack.

Adams, Henry, Johnson and the defendant were arrested and, in a four count substitute information, charged with murder, conspiracy to commit murder and two counts of assault in the first degree. The four cases were consolidated and tried together. With regard to the defendant, the jury was unable to reach a unanimous verdict, and the court declared a mistrial.[5] In a second trial, the defendant was found guilty on all four counts, and the court imposed a total effective sentence of ninety years imprisonment. This appeal followed. Additional facts will be set forth as necessary to resolve the defendant's claims.

I

The defendant first claims that the evidence at trial was insufficient to sustain his conviction of murder and

---

[5] Adams and Henry were convicted on all charges at the first trial. We affirmed their convictions on appeal. See *State* v. *Henry*, 72 Conn. App. 640, 805 A.2d 823, cert. denied, 262 Conn. 917, 811 A.2d 1293 (2002); *State* v. *Adams*, 72 Conn. App. 734, 806 A.2d 111, cert. denied, 262 Conn. 916, 811 A.2d 1292 (2002). The court in the first trial also declared a mistrial with regard to Johnson, who subsequently was retried and convicted of murder, conspiracy and assault. See *State* v. *Henry*, supra, 644 n.4.

assault in the first degree. Specifically, the defendant argues that the evidence was insufficient to support his conviction under a theory of accessorial liability because the state failed to present evidence that he aided another person to commit murder and assault in the first degree.[6] We disagree.

As a preliminary matter, we note that the defendant's claim of evidentiary insufficiency is reviewable even if it may not have been properly preserved at trial. "Unpreserved sufficiency claims are reviewable on appeal because such claims implicate a defendant's federal constitutional right not to be convicted of a crime upon insufficient proof. . . . Our Supreme Court has stated that *Jackson* v. *Virginia*, [443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)], compels the conclusion that any defendant found guilty on the basis of insufficient evidence has been deprived of a constitutional right, and would therefore necessarily meet the four prongs of [*State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989)]. . . . Thus . . . there is no practical reason for engaging in a *Golding* analysis of a claim based on the sufficiency of the evidence . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Estrada*, 71 Conn. App. 344, 349–50, 802 A.2d 873, cert. denied, 261 Conn. 934, 806 A.2d 1068 (2002). We will review the defendant's challenge to the sufficiency of the evidence as we do any properly preserved claim.

The following additional facts are relevant to the defendant's claim. At trial, the state called Ogman, who testified that as he and the other victims stood in the courtyard at the project around 2 a.m. on December 14, 1996, four individuals emerged from a nearby tunnel. Ogman stated that he recognized them as Adams, Henry,

---

[6] The defendant also argues that the evidence was insufficient to support his conviction under a theory of principal liability. Because we conclude that the evidence was sufficient to support his conviction as an accessory, we need not address his additional argument.

Johnson and the defendant, and that they all were firing guns. Clark also testified that he saw the defendant carrying a gun.

The state also called Richard Pelletier, a detective with the New Haven police department who was assigned to the state police gang unit at the time of the shooting. Pelletier testified as follows. Adams, Henry, Johnson and the defendant all were members of the Island Brothers gang. In late 1996, the Island Brothers were upset about the recent killing of one of their members, sixteen year old Tyrese Jenkins. Charles Green and Duane Clark, who were members of a loosely knit rival group known as the Ghetto or the Ghetto Brothers, had been arrested in connection with Jenkins' death.[7] The Island Brothers vowed to avenge Jenkins' death by killing sixteen of the Ghetto Brothers. The victims in the present case, Andre Clark, Ogman and Smith, all were associated with the Ghetto Brothers. Pelletier also testified that after the December 14, 1996 shooting, he was sent to locate Adams, Johnson and the defendant. He found them together at Johnson's house at approximately 11 a.m.

Edmond Comfort, a photographer, testified that he was working at the Melebus Club, a New Haven nightclub, on the night of December 13 and in the early morning of December 14, 1996. He identified several photographs that he took that night, and the photographs were admitted into evidence. Comfort identified three of the individuals in the photographs as Adams, Henry and the defendant. Raymond Johannes, an officer with the New Haven police department, testified that

---

[7] Green subsequently was convicted of Jenkins' murder. See *State* v. *Green*, 62 Conn. App. 217, 774 A.2d 157 (2001), aff'd, 261 Conn. 653, 804 A.2d 810 (2002). Duane Clark was convicted of criminal possession of a pistol or revolver. *State* v. *Clark*, 62 Conn. App. 182, 774 A.2d 183 (2001), aff'd, 260 Conn. 813, 801 A.2d 718 (2002).

the Melebus Club is in close proximity to the project where the victims were shot.

"The standard of review we apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Meehan*, 260 Conn. 372, 377–78, 796 A.2d 1191 (2002).

General Statutes § 53a-8 (a) provides that "[a] person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender." "[T]here is no such crime as being an accessory . . . . The accessory statute merely provides alternate means by which a substantive crime may be committed. . . . This state . . . long ago adopted the rule that there is no practical significance in being labeled an accessory or a principal for the purpose of determining criminal responsibility. . . . The modern approach is to abandon completely the old common law terminology and simply provide that a person is legally accountable for the conduct of another when he is an accomplice of the other person in the commission of the crime. . . . [The] labels [of accessory and principal] are hollow . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Solek*, 242 Conn. 409, 421–22, 699 A.2d 931 (1997).

"Since under our law both principals and accessories are treated as principals . . . if the evidence, taken in the light most favorable to sustaining the verdict, establishes that [the defendant] committed the [crime] charged or did some act which forms . . . a part thereof, or directly or indirectly counseled or procured any persons to commit the offenses or do any act forming a part thereof, then the convictions must stand. . . . To prove guilt as a principal, the state must prove each element of the offense charged beyond a reasonable doubt. To be guilty as an accessory one must share the criminal intent and community of unlawful purpose with the perpetrator of the crime and one must knowingly and wilfully assist the perpetrator in the acts which prepare for, facilitate or consummate it." (Internal quotation marks omitted.) *State* v. *Diaz*, 237 Conn. 518, 543, 679 A.2d 902 (1996). "Whether a person who is present at the commission of a crime aids or abets its commission depends on the circumstances surrounding his presence there and his conduct while there." (Internal quotation marks omitted.) *State* v. *Delgado*, 247 Conn. 616, 622, 725 A.2d 306 (1999).

The defendant does not dispute that the evidence is sufficient to support a finding that he and his fellow gang members traveled to the project on December 14, 1996, with the intention of killing members of the Ghetto Brothers and that upon arrival they shot at the victims, killing Smith and injuring Andre Clark and Ogman. The defendant argues, however, that this evidence is insufficient to establish that the defendant "intentionally [aided] another person to engage in conduct which constitutes an offense" under § 53a-8 (a). Specifically, the defendant argues that to obtain a conviction under § 53a-8 (a), the state must prove more than that he acted in concert with another pursuant to a common design.[8] According to the defendant, the state must

---

[8] The defendant also argues that he cannot be convicted under General Statutes § 53a-8 because his liability, if any, would have been under the

prove that but for his conduct, the principal offender would not have succeeded in completing the crime.

This is not a case of first impression. Contrary to the defendant's assertion, previous cases with facts similar to those presented here indicate that a showing of concert of action between a defendant and another person can provide a sufficient basis for accessorial liability. For example, the defendant in *State* v. *Delgado*, supra, 247 Conn. 619–20, fired thirteen shots at a member of a rival gang. While the defendant was shooting, one of his fellow gang members, known by the nickname "Cheesecake," also began shooting at the victim, and the two of them continued to shoot as the victim fled. Id. The defendant and Cheesecake left the scene separately, and the victim later died from gunshot wounds. Id., 620. The defendant thereafter made a statement to police in which he indicated that he was aware that he and Cheesecake were shooting at the same time. Id., 622. The court concluded: "Although the evidence did not reveal whether it was the defendant or Cheesecake who had fired the shot that fatally injured the victim, the jury reasonably could have determined that *there was sufficient concert of action between the defendant and Cheesecake to support the accessory allegation.*" (Emphasis added.) Id., 623.

Similarly, in *State* v. *Diaz*, supra, 237 Conn. 522–23, the defendant and four companions fired approximately thirty-five to forty gunshots at a passing vehicle, killing one of the occupants. The defendant claimed that the evidence was insufficient to support his conviction of murder under an accessory theory of liability. Id., 541. The Supreme Court disagreed, stating: "Although the

theory expressed in *Pinkerton* v. *United States*, 328 U.S. 640, 647–48, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946). The defendant has not provided any authority for the proposition that *Pinkerton* liability precludes liability under § 53a-8, and we are unaware of any such authority. We therefore find the defendant's argument to be without merit.

evidence did not clearly demonstrate which of the perpetrators actually fired the shot that fatally injured [the victim], the evidence did establish that the defendant and his companions together prepared and readied themselves for the ambush by retrieving their weapons and hiding to avoid notice. As the [vehicle] approached, the men took aim at it and its occupants, firing repeatedly into the vehicle with the intent to kill one or more of the passengers. If the state's version of the facts is credited, *the evidence shows sufficient concert of action between the defendant and his companion[s] to support . . . the accessory allegation . . . .* Accordingly, the defendant's claims of evidentiary insufficiency are without merit." (Citation omitted; emphasis added; internal quotation marks omitted.) Id., 544; see also *State* v. *Orta*, 66 Conn. App. 783, 790–91, 786 A.2d 504 (2001), cert. denied, 259 Conn. 907, 789 A.2d 997 (2002); *State* v. *Bond*, 49 Conn. App. 183, 197–98, 713 A.2d 906, cert. denied, 247 Conn. 915, 722 A.2d 808 (1998).

In the present case, the evidence adduced at trial, construed in the light most favorable to sustaining the verdict, reasonably could have supported the following findings: That the defendant and his fellow gang members had a shared motive for shooting the victims, namely, revenge for the death of Jenkins; that they met and traveled together to the project in the early morning of December 14, 1996, with the intent to kill members of the Ghetto Brothers; that upon reaching the project, the defendant and his companions all fired their weapons at the victims; and that three of the assailants, including the defendant, were found together several hours after the shooting. We conclude that those facts, like those in the cases previously discussed, demonstrate sufficient concert of action to support a conviction under the accessory theory of liability. The jury reasonably could have found beyond a reasonable

doubt that the defendant committed the crimes of murder and assault in the first degree. The defendant's claim of evidentiary insufficiency therefore is without merit.

## II

We next address the defendant's claim that the prosecutor committed misconduct during rebuttal argument. The defendant argues that the prosecutor violated his right to due process under the federal and state constitutions by arguing during rebuttal that the defendant personally may have shot Smith in the head and that the defendant used a revolver. The defendant argues in the alternative that should we find no constitutional violation, we should invoke our supervisory authority to reverse the judgment of conviction. We are not persuaded.

The following additional facts underlie the defendant's claim of prosecutorial misconduct. At trial, Ogman testified as follows. During the attack, Ogman was shot in the left leg, causing him to fall to the pavement. As he lay on the ground, he looked up and saw Henry and Johnson standing over him. At the same time, he heard more shooting coming from the direction of the location of Smith.

The jury also heard the following testimony from Charles Clark, the brother of Andre Clark and cousin of Smith. Charles Clark was at the project looking for his brother on the morning of December 14, 1996, when he heard gunfire and saw two people on the ground. He later discovered that they were Ogman and Smith. A third person, who was standing over Smith, told Smith that he was going to kill him and also said something about "the island." More shooting followed, after which Charles Clark saw someone in a yellow and black jacket running away. The person in the yellow and black jacket was not the same person who had been standing over Smith.

The state presented the following additional testimony regarding the yellow and black jacket. Pelletier testified that when he arrested Adams on the morning of December 14, 1996, Adams was wearing a yellow and black jacket. Pelletier identified, and the court admitted into evidence, a photograph of the jacket Adams was wearing. Charles Clark identified the jacket in the photograph as the same one he saw on the person running away after the shooting.

Edward McPhillips of the department of public safety forensics laboratory testified regarding the ballistics evidence recovered from the crime scene and from the victims' bodies. McPhillips opined that all of the bullets recovered, with the exception of bullet fragments recovered from Smith's brain, were fired from two weapons. He testified that the fragments recovered from Smith's brain were too damaged to be identified. He testified further that in his opinion, the shell casings recovered from the crime scene were fired from two weapons. He also explained that a semiautomatic weapon ejects a shell casing each time it is fired, while a revolver does not because the casing remains in the cylinder of the revolver.

During closing argument, defense counsel argued that the jury could conclude that there were only two shooters, that the defendant was not present at the scene of the shooting and that "this may well be simply a case of guilt by association." During rebuttal, the prosecutor argued: "I told you I wasn't going to do this and now I am. We don't have to prove who pulled what trigger. But you know what? There are very, very good reasons to believe that the person who shot Jason Smith in the head as he was lying crippled on the ground is that man sitting over there, and I'll tell you why. Right here, at the time that shooting occurs, there are two people standing next to Marvin Ogman, who is this blood spot. Who are they? Darcus Henry and Johnny

Johnson. Their feet are right there. 'I looked and I saw their feet, and I looked up.' They're not back over here tapping Jason Smith. And Sean Adams is the last guy to go and has the bright orange jacket. And, therefore, according to Charles Clark, it's a different guy than the one who was standing over him saying, 'I'm from the Island; you're going to die.' Right? That guy wasn't wearing the bright orange. The guy who ran—the other guy did it, and it's not the same person. So, we've eliminated Darcus Henry and Johnny Johnson and by Charles Clark's testimony, not the guy in the orange—in the bright yellow coat. We've eliminated him. Who's left to pull that trigger into the head of Jason Smith? Now, it doesn't matter from the proof that we haven't proved, but it matters morally. It's not an uninvited fact when you look at the man over there and hear arguments that tell you to ignore reality, to ignore common sense, to ignore what actually you had heard and seen, experienced in this courtroom. That's what matters. It's all in there. If he shot with a revolver, leaves nothing behind, and with the exception of this one shell here, there are no other shells here. There's no shells near that body. That's another reason why we could easily have had revolvers there without having any ballistic evidence . . . because somebody shot Jason Smith in the head, and there's no ejected shells very close to where he is."

The defendant argues that the comments of the prosecutor during rebuttal were improper because they were not reasonably supported by the evidence and that this claim implicates the right to due process. Specifically, the defendant asserts that the argument that he may have shot Smith in the head was improper because it was based on a complex process of elimination, rather than direct evidence that the person standing near Smith was the defendant. He further argues that the state could not properly argue that the defendant used

a revolver because there was no direct evidence indicating the presence or use of a revolver.

The defendant did not properly preserve his claim of prosecutorial misconduct in violation of his right to due process by objecting at trial to the prosecutor's comments. He therefore seeks review of his claim pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40.[9] "We will not afford *Golding* review to [unpreserved] claims of prosecutorial misconduct where the record does not disclose a pattern of misconduct pervasive throughout the trial or conduct that was so blatantly egregious that it infringed on the defendant's right to a fair trial. . . . [I]n addressing the jury, [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of the argument. . . . [M]oreover . . . [*Golding*] review of such a claim is unavailable where the claimed misconduct was not blatantly egregious and merely consisted of isolated and brief episodes that did not reveal a pattern of conduct repeated throughout the trial . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Bonsu*, 54 Conn. App. 229, 238, 734 A.2d 596, cert. denied, 251 Conn. 909, 739 A.2d 1249 (1999). The defendant does not claim that there was a pattern of misconduct repeated throughout the trial. Accordingly, our analysis under *Golding* is limited to determining

---

[9] In *Golding*, our Supreme Court held that "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40.

whether the remarks during rebuttal argument were so blatantly egregious that they infringed on the defendant's right to a fair trial.

"Counsel may comment upon facts properly in evidence and upon reasonable inferences to be drawn from them. . . . Counsel may not, however, comment on or suggest an inference from facts not in evidence." (Citation omitted; internal quotation marks omitted.) *State* v. *Prioleau*, 235 Conn. 274, 320, 664 A.2d 743 (1995). "It is within the province of the jury to draw reasonable and logical inferences from the facts proven. . . . We note that the probative force of the evidence is not diminished because it consists, in whole or in part, of circumstantial evidence rather than direct evidence. . . . It has been repeatedly stated that there is no legal distinction between direct and circumstantial evidence so far as probative force is concerned." (Internal quotation marks omitted.) *State* v. *Orta*, supra, 66 Conn. App. 788–89.

"[I]t is a function of the jury to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . Because [t]he only kind of an inference recognized by the law is a reasonable one . . . any such inference cannot be based on possibilities, surmise or conjecture. . . . It is axiomatic, therefore, that [a]ny [inference] drawn must be rational and founded upon the evidence. . . . However, [t]he line between permissible inference and impermissible speculation is not always easy to discern. When we infer, we derive a conclusion from proven facts because such considerations as experience, or history, or science have demonstrated that there is a likely correlation between those facts and the conclusion. If that correlation is sufficiently compelling, the inference is reasonable. But if the correlation between the facts and the conclusion is slight, or if a different conclusion is more closely correlated with the

facts than the chosen conclusion, the inference is less reasonable. At some point, the link between the facts and the conclusion becomes so tenuous that we call it speculation. When that point is reached is, frankly, a matter of judgment. . . .

"[P]roof of a material fact by inference from circumstantial evidence need not be so conclusive as to exclude every other hypothesis. It is sufficient if the evidence produces in the mind of the trier a reasonable belief in the probability of the existence of the material fact. . . . Thus, in determining whether the evidence supports a particular inference, we ask whether that inference is so unreasonable as to be unjustifiable. . . . In other words, an inference need not be compelled by the evidence; rather, the evidence need only be reasonably susceptible of such an inference. Equally well established is our holding that a jury may draw factual inference on the basis of already inferred facts. . . . Moreover, [i]n viewing evidence which could yield contrary inferences, the jury is not barred from drawing those inferences consistent with guilt and is not required to draw only those inferences consistent with innocence." (Citations omitted; internal quotation marks omitted.) *State* v. *Copas*, 252 Conn. 318, 338–40, 746 A.2d 761 (2000).

We are not persuaded that the prosecutor's argument that the defendant may have shot Smith in the head was improper, let alone so blatantly egregious that it infringed on the defendant's right to a fair trial. The defendant characterizes the state's rebuttal argument as "a convoluted patchwork of reasons why it was not other assailants . . . despite no direct evidence of [the defendant's] proximity to Smith at any time . . . ." As the authorities previously cited indicate, however, we do not distinguish between direct and circumstantial evidence. The prosecutor's argument was based on facts properly in evidence and inferences that the jury

could reasonably have drawn from those facts. Although the jury, to arrive at the conclusion that the defendant shot Smith in the head, was required to apply a process of elimination based on multiple inferences, such a process is permissible.

The state's argument that the defendant used a revolver to shoot Smith presents a closer question. Although that argument was based on facts in evidence, the prosecutor, by arguing to the jurors that they could infer from those facts that the defendant had used a revolver, ventured close to " '[t]he line between permissible inference and impermissible speculation . . . .' " Id., 339. The argument was not, however, so blatantly egregious that it infringed on the defendant's right to a fair trial. The defendant's claim of prosecutorial misconduct therefore fails under *Golding*.

We next consider the defendant's argument that we should exercise our supervisory authority to reverse his conviction. "Appellate courts possess an inherent supervisory authority over the administration of justice. . . . The standards that [are] set under this supervisory authority are not satisfied by observance of those minimal historic safeguards for securing trial by reasons which are summarized as due process of law . . . . Rather, the standards are flexible and are to be determined in the interests of justice. . . . [O]ur supervisory authority [however] is not a form of free-floating justice, untethered to legal principle. . . . Rather, the integrity of the judicial system serves as a unifying principle behind the seemingly disparate use of our supervisory powers. . . . [O]ur supervisory powers are invoked only in the rare circumstance where [the] traditional protections are inadequate to ensure the fair and just administration of the courts . . . ." (Internal quotation marks omitted.) *State* v. *Mukhtaar*, 253 Conn. 280, 290 n.11, 750 A.2d 1059 (2000).

We can see no reason to exercise our supervisory powers in the present case. The prosecutor's argument that the defendant used a revolver to shoot Smith was an isolated occurrence during rebuttal argument. It also concerned a matter, namely, what kind of gun the defendant used, which was not at issue in the case. As we indicated in part I, the evidence was sufficient to support the defendant's conviction under an accessory theory of liability, and the state relied solely on that theory of liability in its initial closing argument to the jury. In sum, this case does not present the rare circumstance in which we must reverse a conviction to ensure the integrity of the judicial system.

The judgment is affirmed.

In this opinion the other judges concurred.