## STATE OF CONNECTICUT *v.* JOHNNY J. JOHNSON
### (AC 23967)

Foti, West and Hennessy, Js.

Argued December 3, 2003—officially released May 11, 2004

*Avery S. Chapman,* special public defender, for the appellant (defendant).

*Timothy J. Sugrue,* senior assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, and *James G. Clark,* senior assistant state's attorney, for the appellee (state).

*Opinion*

HENNESSY, J. The defendant, Johnny J. Johnson, appeals from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes §§ 53a-54a (a) and 53a-8 (a), conspiracy to commit murder in violation of General Statutes §§ 53a-54a (a) and 53a-48 (a), and two counts of assault in the first degree in violation of General Statutes §§ 53a-59 (a) (5) and 53a-8 (a). On appeal, the defendant claims that the trial court improperly (1) admitted into evidence testimony regarding his alleged gang membership, (2) denied his motion to suppress a victim's pretrial photographic identification, (3) violated his constitutional right to confrontation and (4) denied his motion for a mistrial. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The defendant was a member of a New Haven street gang known as the Island Brothers. On December 14, 1996, at approximately 2 a.m., the defendant and three other gang members[1] emerged from a tunnel firing bullets into the courtyard of a New Haven housing project. One victim, Jason Smith, died as a result of the gunfire. Two other victims, Marvin Ogman and Andre

---

[1] Sean Adams, Darcus Henry and Carlos Ashe each have been convicted of the crimes of murder, conspiracy to commit murder and assault in the first degree as a result of the incident. See *State* v. *Ashe,* 74 Conn. App. 511, 812 A.2d 194, cert. denied, 262 Conn. 949, 817 A.2d 108 (2003); *State* v. *Adams,* 72 Conn. App. 734, 806 A.2d 111, cert. denied, 262 Conn. 916, 811 A.2d 1292 (2002); *State* v. *Henry,* 72 Conn. App. 640, 805 A.2d 823, cert. denied, 262 Conn. 917, 811 A.2d 1293 (2002).

Clark, suffered serious injuries. Additional facts will be set forth as they become relevant to resolving the defendant's claims.

I

The defendant claims that the court improperly admitted into evidence testimony regarding his gang membership. He specifically argues (1) that the testimony was not relevant to prove whether he committed the crimes at issue and, furthermore, that the prejudicial effect of such testimony outweighed its probative value because none of the witnesses could establish that he was a known member of the Island Brothers or that he was acting in concert with the Island Brothers on the evening in question, and (2) the testimony amounted to what was essentially uncharged misconduct evidence that did not satisfy any exception to the prohibition against the introduction of uncharged prior misconduct evidence. We disagree with the defendant.

The following additional facts are necessary for our resolution of the defendant's claim. During the presentation of the state's case-in-chief, three witnesses testified that the defendant was a member of the Island Brothers gang.[2] On the night in question, several Island

---

[2] The following colloquy occurred during the state's direct examination of Clark:

"[The Prosecutor]: Now, again, according to your testimony about who you saw running by and who had guns in their hands, there's three people you're sure of and then a pair of people that you're not sure of between, correct?

"[The Witness]: Correct.

"[The Prosecutor]: Darcus Henry, Sean Adams, Carlito Ashe and then either [the defendant] or Gaylord Salters?

"[The Witness]: Right.

"[The Prosecutor]: Were all five of those people members of the Island [Brothers] at that time?

"[The Witness]: Yeah."

During the state's direct examination of Ogman, he identified Darcus Henry, Sean Adams, Carlos Ashe and the defendant as his assailants. Shortly thereafter, the following colloquy, in relevant part, occurred:

Brothers attended a function at the Melebus Club in New Haven. At trial, the state introduced photographs that were taken at the Melebus Club by a professional photographer. Sean Adams, Darcus Henry and Carlos Ashe, who have been convicted of various crimes as a result of the incident at issue; see footnote 1; appear in those photographs; the defendant, however, does not. There was no indication that the defendant was at the Melebus Club that evening. The defendant's girl-friend testified that the defendant was in her company from approximately 11:15 p.m. on the evening in question until sometime the next morning. Ogman, however,

"[The Prosecutor]: Now, you've named four people here. Did you associate those four people in any way with a particular group?

"[The Witness]: Yes, I do.

"[The Prosecutor]: And what was that group?

"[The Witness]: The Island Brothers.

"[The Prosecutor]: What's the Island Brothers?

"[The Witness]: It's a gang.

"[The Prosecutor]: All right, and centered where?

"[The Witness]: [I]n New Haven."

As part of its case-in-chief, the state introduced the testimony of Detective Richard Pelletier. Pelletier was a member of the state police gang task force from approximately 1995 until 1999. Pelletier testified that he became familiar with the Island Brothers gang and the defendant during his work on the task force. The following colloquy occurred:

"[The Prosecutor]: Was [the defendant] a member of the Island Brothers in December of 1996?

"[The Witness]: Yes.

\* \* \*

"[The Prosecutor]: Now, when you say that [the defendant] was a member of the Island Brothers, is that based upon only the fact that he lived out there?

"[The Witness]: No . . . .

"[The Prosecutor]: Are there other reasons other than his association with this group of people that caused you to say that he's an Island Brother?

"[The Witness]: Yes.

"[The Prosecutor]: And what are those reasons?

"[The Witness]: My conversations with him . . . .

"[The Prosecutor]: What was the nature of those conversations that lead you to this conclusion that he was among those who were full members of the Island Brothers?

"[The Witness]: They, the members, including [the defendant], told us they are the Island Brothers.

"[The Prosecutor]: Okay. So, directly out of his own mouth?

"[The Witness]: Yes, sir."

testified that he clearly saw the defendant in the court-yard during the shooting.

The testimony at trial also revealed a strained relationship between the Island Brothers and another New Haven gang, the Ghetto Boys. The victims in the present case, Ogman, Clark and Smith, were all associated with the Ghetto Boys. Clark testified that an ongoing dispute between the rival groups "just got deeper" in December, 1996. Detective Richard Pelletier, a member of the state police gang task force, who was familiar with the defendant as a result of working on the task force, also testified as to the ongoing dispute. He testified that the events of December 4, 1996, may have been retaliation by the Island Brothers for the recent killing of one of its members, sixteen year old Tyrese Jenkins.[3] Pelletier testified that the Island Brothers had decided to kill one Ghetto Boy for every year of Jenkins' life.[4] In light of that information, the state proffered testimony regarding the defendant's gang membership, the Island

[3] "Charles Green and Duane Clark, who were members of . . . the Ghetto [Boys], had been arrested in connection with Jenkins' death." *State* v. *Ashe,* 74 Conn. App. 511, 515 & n.7, 812 A.2d 194, cert. denied, 262 Conn. 949, 817 A.2d 108 (2003). "Green subsequently was convicted of Jenkins' murder. See *State* v. *Green,* 62 Conn. App. 217, 774 A.2d 157 (2001), aff'd, 261 Conn. 653, 804 A.2d 810 (2002). Duane Clark was convicted of criminal possession of a pistol or revolver. *State* v. *Clark,* 62 Conn. App. 182, 774 A.2d 183 (2001), aff'd, 260 Conn. 813, 801 A.2d 718 (2002)." *State* v. *Ashe,* supra, 515 n.7.

[4] For clarity's sake, we note that although the defendant's objection to the statement, on hearsay grounds, was overruled at trial, he does not squarely claim on appeal that the court improperly admitted the statement. He does, however, allude to it in his brief, and we therefore address the issue to the extent that it will aid in our analysis. As such, we conclude that Pelletier's testimony was not inadmissible hearsay because it supported the opinion he previously had expressed as to the gangs' hostile relationship. "Police officers must rely on communications with gang members to gather intelligence and for opinions about gang activity because most gangs do not have bylaws, organizational minutes or any other normal means of identification." *State* v. *Henry,* 72 Conn. App. 640, 658, 805 A.2d 823, cert. denied, 262 Conn. 917, 811 A.2d 1293 (2002); see also *State* v. *Singh,* 59 Conn. App. 638, 650–54, 757 A.2d 1175 (2000), rev'd on other grounds, 259 Conn. 693, 793 A.2d 226 (2002).

Brothers' vow to avenge the death of Jenkins and Ogman's testimony placing the defendant in the housing project, as necessary to show conspiracy and motive.

## A

It is well settled that absent a clear abuse of discretion, a trial court's determination of relevancy will not be disturbed. *State* v. *Perry*, 48 Conn. App. 193, 201, 709 A.2d 564, cert. denied, 244 Conn. 931, 711 A.2d 729 (1998).

### 1

The defendant first claims that the testimony regarding gang affiliation was not relevant because "there was no established membership of the defendant to a gang." That argument is baseless given that three witnesses testified that the defendant was a member of the Island Brothers gang.[5] We therefore find it unnecessary to review that claim.

### 2

The defendant next claims that the testimony of Pelletier relating to the ongoing dispute between the Island Brothers and the Ghetto Boys did not directly implicate the defendant and was therefore irrelevant to material issues and was prejudicial. We disagree with the defendant's claim and conclude that the court properly found that the evidence of gang affiliation was relevant to prove motive and conspiracy.

The evidence presented showed that the Island Brothers and the Ghetto Boys were feuding, and that the Island Brothers intended to harm members of the Ghetto Boys. In addition, the defendant was shown to be a member of the Island Brothers. In determining the relevancy of the gang evidence, the court aptly stated that "the fact that there are two rival gangs may tend

---

[5] See footnote 2.

to be evidence bearing on motive, identification and with respect to conspiracy and agreement and the parties knowing each other in one group, and the evidence with respect to gang affiliation is relevant to the issues in this case." Accordingly, we conclude that it was not a clear abuse of discretion for the court to allow the testimony regarding gang affiliation.

## B

The defendant next claims that the evidence showing that he was not in the company of Henry, Adams and Ashe hours before the shooting, coupled with his alibi witness who accounted for his whereabouts during and after the events, effectively demonstrated that he was not present when the shooting occurred. He then argues that because Pelletier's testimony describing the ongoing dispute between the gangs did not directly implicate him, the testimony served to prejudice the jury unduly against him. In other words, the defendant argues that because the state did not show that he was directly involved in Jenkins' murder, any testimony about the murder and the Island Brothers gang's decision to kill Ghetto Boys as retribution was prejudicial in that it would lead to the inference that the defendant had a motive to participate in the events of December 14, 1996. We disagree.

"Although relevant, evidence may be excluded by the trial court if the court determines that the prejudicial effect of the evidence outweighs its probative value. . . . Of course, [a]ll adverse evidence is damaging to one's case, but it is inadmissible only if it creates undue prejudice so that it threatens an injustice were it to be admitted. . . . The test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will improperly arouse the emotions of the jury. . . . The trial court . . . must determine whether the adverse impact of the chal-

lenged evidence outweighs its probative value. . . . Finally, [t]he trial court's discretionary determination that the probative value of evidence is not outweighed by its prejudicial effect will not be disturbed on appeal unless a clear abuse of discretion is shown. . . . [B]ecause of the difficulties inherent in this balancing process . . . every reasonable presumption should be given in favor of the trial court's ruling. . . . Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *Henry*, 72 Conn. App. 640, 659, 805 A.2d 823, cert. denied, 262 Conn. 917, 811 A.2d 1293 (2002).

We conclude that the evidence was not unduly prejudicial to the defendant. Although the testimony that the defendant was a member of a gang that had vowed to kill members of a rival gang and that he was seen participating in the courtyard shooting by one of the victims of that shooting may have been contrary to his defense, we cannot say that the evidence was unduly prejudicial. We agree with the court's statement that "[t]he jury could reasonably be told that the fact that somebody is a member of a gang is not evidence that they are guilty of anything. He's not on trial for being a member of a gang, he's on trial for these specific charges, and if defense counsel . . . can persuade the jury that the defendant was not a member of a gang or that this was not a gang event or that [the] whole business about gang affiliation is totally irrelevant, that may prevail then, but as [it is] for the jury to decide, this is information that should be made available to them."[6]

---

[6] In its charge to the jury, the court stated in relevant part: "During the trial, you have heard evidence of alleged gang membership or affiliation on the part of the defendant and evidence of a dispute between two gangs. The defendant is not on trial for gang membership, which standing alone is not a crime. You cannot consider gang membership, if you find it exists, as evidence of bad character or of a tendency to commit criminal acts. . . . It is entirely up to you to decide whether or not the defendant and others were members of a gang and, if so, what relevance, if any, that evidence

Accordingly, we conclude that the court did not abuse its discretion in admitting the testimony.

## C

The defendant also claims that it was improper for the court to admit evidence of his gang affiliation because it amounted to uncharged misconduct evidence that did not satisfy any exception to the prohibition against evidence of uncharged prior misconduct. We disagree.

"As a general rule, evidence of a *defendant's* prior crimes or misconduct is not admissible." (Emphasis in original; internal quotation marks omitted.) *State* v. *Adorno*, 45 Conn. App. 187, 191, 695 A.2d 6, cert. denied, 242 Conn. 904, 697 A.2d 688 (1997). "It is well settled that evidence of prior misconduct is admissible for the limited purposes of showing intent, an element in the crime, identity, malice, motive or a system of criminal design." *State* v. *Taylor*, 239 Conn. 481, 501, 687 A.2d 489 (1996), cert. denied, 521 U.S. 1121, 117 S. Ct. 2515, 138 L. Ed. 2d 1017 (1997). "The trial judge, however, must determine in the exercise of judicial discretion that its probative value outweighs its prejudicial tendency. . . . Because of the difficulties inherent in this balancing process, the trial court's decision will be reversed only where an abuse of discretion is manifest or where an injustice appears to have been done." (Citation omitted; internal quotation marks omitted.) *State* v. *Adorno*, supra, 192.

We conclude that the testimony regarding the defendant's gang affiliation did not constitute evidence of the defendant's prior misconduct because it did not

has to conspiracy, motive or identity and what weight to give that evidence, if any."

"It is well settled law that jurors are presumed to follow the court's directions in the absence of a clear indication to the contrary." (Internal quotation marks omitted.) *State* v. *Vasquez*, 79 Conn. App. 219, 242, 830 A.2d 261, cert. denied, 266 Conn. 918, 833 A.2d 468 (2003).

show any bad act or criminal conduct on his part. See *State* v. *Brown*, 41 Conn. App. 317, 324, 675 A.2d 1369 (1996), rev'd on other grounds, 242 Conn. 445, 700 A.2d 1089 (1997). Moreover, insofar as the testimony associated the defendant with the Island Brothers, such association, by itself, does not demonstrate any bad act or criminal conduct on the part of the defendant. See *State* v. *Taylor*, supra, 239 Conn. 502.

## II

The defendant next argues that the court improperly denied his motion to suppress Ogman's pretrial photographic identification. The defendant claims that the photographic identification procedure was unnecessarily suggestive because the photographic array from which he was identified included other members of a gang disliked by Ogman and, therefore, under the totality of the circumstances, the identification was unreliable. We disagree.

The court reasonably could have found the following facts during the hearing on the motion to suppress. During a conversation with Edwin Rodriguez, a detective with the New Haven police department, and John Dalton, an officer with the New Haven police department, Ogman identified Henry, Ashe, Adams and the defendant as the perpetrators of the December 14, 1996 shootings. Ogman also stated that he saw a fifth person shooting a weapon from farther away, but he could not make out his face. Thomas Trocchio, a detective with the New Haven police department, then compiled a photographic array that included one photograph of each named suspect placed randomly within a sequence of seven look-alike photographs. Thus, Ogman was to choose the four named suspects from a stack of thirty-two photographs. At the hearing, the state stipulated that at least three of the look-alikes were members of the Island Brothers gang.

The identification procedure took place at a hospital soon after Ogman received medical attention there for gunshot wounds to his right arm and left leg. Trocchio, Rodriquez and Richard Foti, a detective with the New Haven police department, were present. Ogman was handed the stack of thirty-two photographs and asked if he recognized anyone from the shooting. He was not informed as to whether photographs of any of the suspects were contained in the array. Ogman successfully picked out the photographs of the four suspects that he originally named and wrote his name in the margin of each photograph. Ogman also testified that his familiarity with the three additional Island Brothers and nine other faces[7] contained in the array had no bearing on his selection of the four suspects. He stated that he chose only the photographs of the individuals he saw that night. The court found that the identification procedure was not unnecessarily suggestive and denied the defendant's motion to suppress in a brief oral decision.[8]

We note that "[b]ecause the issue of the reliability of an identification involves the constitutional rights of an accused . . . we are obliged to examine the record scrupulously to determine whether the facts found are adequately supported by the evidence and whether the court's ultimate inference of reliability was reasonable." (Internal quotation marks omitted.) Id., 498. The defen-

---

[7] It is unclear from the record whether the other nine people were members of the Island Brothers or if Ogman knew them in some other capacity.

[8] The court stated in relevant part: "The fact that the Island Brothers—several pictures were pictures of members of the Island Brothers—the court finds to be totally irrelevant. The identification was made by the witness without any suggestions by the police either prior to the showing of the array or during the showing of the array, and he was given thirty-two pictures, which he went through one by one, and when he recognized the picture of one of the shooters, he handed it over to the police officer present and he signed it . . . and positively identified this defendant as one of the shooters."

dant bears the burden of proving that the identification procedures that resulted in his identification violated his due process rights. *State* v. *Sanchez*, 69 Conn. App. 576, 580–81, 795 A.2d 597 (2002). To succeed, the defendant must show "first [that] the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on an examination of the totality of the circumstances." (Internal quotation marks omitted.) Id., 580. "An identification procedure is unnecessarily suggestive only if it gives rise to a very substantial likelihood of irreparable misidentification. . . . If the procedures used to identify the defendant were not unnecessarily suggestive, we need not independently analyze whether the identification was reliable." (Citation omitted; internal quotation marks omitted.) *State* v. *Taylor*, supra, 239 Conn. 499.

On the basis of our review of the record, we conclude that the photographic array presented to Ogman did not constitute an impermissibly suggestive pretrial identification procedure. Taking into account the array and Ogman's familiarity with the defendant, we agree with the court that there was not a very substantial likelihood of irreparable misidentification because of unnecessary suggestiveness. In this case, the witness named all four shooters prior to the compilation of the array and he picked all four suspects from thirty-two photographs. Furthermore, he testified that although he was familiar with other faces included in the array, and that he saw *five* people involved in the shooting, he picked out only the *four* people whose faces he clearly saw. Moreover, we agree with the state that the fact that Ogman may have believed that a particular photograph depicted an Island Brother was not suggestive of anything. The fact that the array included several photographs of Island Brothers not named by Ogman as shooters also was

not suggestive of anything. Ogman still had to select the photographs of the four people who were the shooters. As such, because Ogman already knew that he had been shot by Island Brothers, the inclusion of Island Brothers in the array did not suggest which photographs he should select. Accordingly, we need not address the defendant's claim that the photographic identification was inherently unreliable.

## III

The defendant's next claim is that the court denied him his constitutional right to confront witnesses by unduly restricting his cross-examinations of Ogman and Rodriguez. Because the defendant has failed to brief those claims adequately, they are deemed to be abandoned.[9] "[F]or this court judiciously and efficiently to consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs." (Internal quotation marks omitted.) *State v. Portee*, 55 Conn. App. 544, 557 n.10, 740 A.2d 868 (1999), cert. denied, 252 Conn. 920, 744 A.2d 439 (2000). In his brief, the defendant cites no law and provides no analysis of his claim. "[A]ssignments of error which are merely mentioned but not briefed beyond a statement of the claim will be deemed abandoned and will not be reviewed by this court." (Internal quotation marks omitted.) Id. We therefore will not review those claims.

[9] We further note that we agree with the state regarding the factual basis of the defendant's claim concerning Detective Rodriquez. The defendant's claim is that during cross-examination, the detective displayed a lack of recall as to the certainty of Ogman's identification of the defendant and that the defendant was denied the opportunity to refresh Rodriguez' recollection, thus inhibiting the right to confrontation. That claim is baseless and fails. Our review of the record shows that Rodriguez answered the defendant's question twice before the defendant sought to refresh his recollection. As there was no need to refresh Rodriguez' recollection, we could not conclude that the evidentiary ruling was an abuse of the court's discretion.

## IV

The defendant's final claim is that the court improperly denied his motion for a mistrial, in which he alleged (1) prosecutorial misconduct during closing arguments and (2) juror misconduct. We disagree.

At the outset, we set forth our standard of review with respect to the decision to grant or to deny a motion for a mistrial. "The standard for review of an action upon a motion for a mistrial is well established. While the remedy of a mistrial is permitted under the rules of practice, it is not favored. [A] mistrial should be granted only as a result of some occurrence upon the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial . . . and the whole proceedings are vitiated. . . . If curative action can obviate the prejudice, the drastic remedy of a mistrial should be avoided. . . . On appeal, we hesitate to disturb a decision not to declare a mistrial. The trial judge is the arbiter of the many circumstances which may arise during the trial in which his function is to assure a fair and just outcome. . . . The trial court is better positioned than we are to evaluate in the first instance whether a certain occurrence is prejudicial to the defendant and, if so, what remedy is necessary to cure that prejudice. . . . The decision whether to grant a mistrial is within the sound discretion of the trial court." (Citations omitted; internal quotation marks omitted.) *State* v. *Taft*, 258 Conn. 412, 418, 781 A.2d 302 (2001).

## A

The defendant claims that the prosecutor committed misconduct by way of certain statements that he made to the jury during the trial.[10]

---

[10] The defendant claims that the prosecutor mischaracterized the extent of the injuries to the victims and interjected improper comments regarding the defendant's sexual practices with more than one partner. The defendant offers no citation or discussion of any authority to support those claims or to show how the statements denied him a fair trial. We decline, therefore,

"Claims of prosecutorial misconduct trigger a two-pronged inquiry. First, we must examine the allegedly improper conduct to determine if it was, in fact, improper and rose to the level of prosecutorial misconduct. If it did, we will analyze the effect of the misconduct to determine if it deprived the defendant of a fair trial. . . . Generally, [i]n evaluating a prosecutorial misconduct claim, we review whether the record discloses a pattern of misconduct pervasive throughout the trial or conduct that was so blatantly egregious that it infringed on the defendant's right to a fair trial." (Citation omitted; internal quotation marks omitted.) *State* v. *McKiernan*, 78 Conn. App. 182, 195–96, 826 A.2d 1210, cert. denied, 266 Conn. 902, 832 A.2d 66 (2003).

The defendant claims that the prosecutor mischaracterized the nature of the weapons used in the shootings by calling them "virtual machine guns."[11] "In determining whether the defendant was denied a fair trial we must view the prosecutor's comments in the context of the entire trial. . . . In examining the prosecutor's argument we must distinguish between those comments whose effects may be removed by appropriate instructions . . . and those which are flagrant and therefore deny the accused a fair trial. . . . The defendant bears the burden of proving that the prosecutor's statements were improper in that they were prejudicial and deprived him of a fair trial. . . . In determining whether prosecutorial misconduct was so serious as to amount to a denial of due process, this court, in

to review those claims, as they have been briefed inadequately. See *Ham* v. *Greene*, 248 Conn. 508, 528–29 n.11, 729 A.2d 740, cert. denied, 528 U.S. 929, 120 S. Ct. 326, 145 L. Ed. 2d 254 (1999); *Butler* v. *Hartford Technical Institute, Inc.*, 243 Conn. 454, 465 n.11, 704 A.2d 222 (1997); *State* v. *James*, 237 Conn. 390, 396 n.10, 678 A.2d 1338 (1996).

[11] Our review of the transcript reveals that the prosecutor actually used the phrase "essential machine gun," rather than "virtual machine guns," as the defendant contends. That difference in terminology does not affect our analysis of the claim.

conformity with courts in other jurisdictions, has focused on several factors. Among them are the extent to which the misconduct was invited by defense conduct or argument . . . the severity of the misconduct . . . the frequency of the misconduct . . . the centrality of the misconduct to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Internal quotation marks omitted.) Id., 196.

Our review of the record reveals that the evidence produced at trial showed that one of the weapons involved in this case was an automatic weapon. Edward McPhillips, a firearms examiner in the department of public safety's forensic laboratory, testified that "[w]ith a full automatic [weapon], when you pull the trigger, the cartridge will continue firing until you release the trigger." As such, the characteristics of an automatic weapon are similar to that of a machine gun, which is broadly defined by the Merriam-Webster's New Collegiate Dictionary (10th Ed. 1993) to be "an automatic weapon." "It is well settled that a prosecutor must not comment on evidence that is not part of the record, nor is he to comment unfairly on the evidence adduced at trial so as to mislead the jury." *State* v. *McKiernan*, supra, 78 Conn. App. 201. Although the actual weapon at issue was an automatic weapon, we cannot conclude that the prosecutor's isolated statement characterizing that weapon as an "essential machine gun" misled the jury or deprived the defendant of a fair trial.

B

The defendant next argues that the court should have granted his motion for a mistrial because, during a court break, one juror spoke with a person attending the trial. He claims that this action constituted a "breach of the juror's oath." He further contends that although the court held a hearing to determine the circumstances of

the alleged misconduct, he was entitled to a "fuller hearing" and a canvass of the jurors. We disagree.[12]

The following facts are relevant to our resolution of the defendant's claim. The verdict was announced on July 8, 2001. On that same afternoon, prior to the announcement of the verdict, the jury took a break from its deliberations. A few of the jurors congregating outside of the courthouse were approached by Lakeya Youins, a friend of the defendant. Youins began to speak to one of the jurors. At that point, the other jurors went inside the courthouse. The defendant learned of that conduct after the verdict was announced and thereafter made an oral motion for a mistrial on the basis of that occurrence. The defendant then filed a motion for reconsideration of the court's denial of his motion for a mistrial. The motion for reconsideration was granted, and an evidentiary hearing regarding the claimed juror misconduct was held by the court on August 7 and 8, 2001.

Several witnesses testified at the evidentiary hearing, including Youins; the juror at issue; the victim, Clark; Inspector John Kosko; Pelletier; a judicial marshal; and the defendant's mother. The court questioned all of the witnesses, and allowed input from the state and the defendant. During her testimony, Youins alleged that within the course of her conversation with the juror, the juror revealed that he was familiar with some of the parties involved in the case, a detail he did not reveal during voir dire, and that he had spoken with Clark in the presence of other jurors at some stage of the proceedings. She further testified that she bears a

---

[12] To the extent that the defendant alleges that an alternate juror engaged in misconduct, we decline to review the claim. We agree with the state that any claim regarding that juror was abandoned or implicitly withdrawn because the defendant had ample opportunity to develop it at the evidentiary hearing and failed to do so. See State v. Jackson, 73 Conn. App. 338, 357–58, 808 A.2d 388, cert. denied, 262 Conn. 929, 814 A.2d 381 (2002).

tattoo depicting a palm tree, grass and water on her right shoulder. Pelletier explained that the tattoo, sometimes accompanied by the words Island Brothers, is a symbol of the Island Brothers gang. Pelletier further testified that from the level of involvement he had observed Youins to have with the Island Brothers, she seemed to be, at the very least, an informal member of the gang. He also revealed that the fathers of her two children are Island Brothers, thus indicating an additional level of attachment to the gang.

The juror explained that when Youins began to speak to him, he ended the conversation because he was prohibited from discussing the case. He further testified that he did not speak with Clark at any time throughout the proceedings. Clark himself testified that he did not speak with any of the jurors during the course of the trial and that he was not at the courthouse on the day the verdict was announced.

On the basis of the testimony presented, the court found that "[the juror] did not speak with Clark at any time between the time the juror was selected and the verdict was rendered. The court also finds that the juror did not speak with Youins, except to tell her that he could not speak to her. The court also finds that the juror . . . knew Tyrese Jenkins, and Tyrese Jenkins was the victim of a shooting and during the trial evidence was introduced as to that incident. The court finds that this knowledge by the juror is extrinsic evidence and, although this is presumptively prejudicial, the court finds in this case that the juror was in fact not prejudiced. This defendant has failed to prove actual bias against the defendant resulted from that knowledge by the juror."

1

"It has long been the law of this state that jurors shall not converse with any person [who is] not a member

of the jury, regarding the cause under consideration . . . . [These] rules are of vital importance to assure that the jury will decide the case free from external influences that might interfere with the exercise of deliberate and unbiased judgment." (Citations omitted; internal quotation marks omitted.) *State* v. *Rhodes*, 248 Conn. 39, 46–47, 726 A.2d 513 (1999).

"It is well established . . . that not every incident of juror misconduct requires a new trial. . . . [D]ue process seeks to assure a defendant a fair trial, not a perfect one. . . . [T]he constitution does not require a new trial every time a juror has been placed in a potentially compromising situation . . . [because] it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. . . . The question is whether or not the misconduct has prejudiced the defendant to the extent that he has not received a fair trial. . . . The defendant has been prejudiced if the misbehavior is such to make it probable that the juror's mind was influenced by it so as to render him or her an unfair and prejudicial juror. . . . We have previously held that . : . [w]here . . . the trial court was in no way responsible for the juror misconduct . . . a defendant who offers proof of juror misconduct bears the burden of proving that actual prejudice resulted from that misconduct." (Citations omitted; internal quotation marks omitted.) Id., 47.

In this case, the court reasonably concluded that the juror's conversation with Youins was not prejudicial to the defendant.[13] Indeed, the court found that the juror

---

[13] The defendant appears to raise an evidentiary claim regarding the admission of a statement that was signed by Youins. We decline to review the claim, as it has been briefed inadequately. "It has long been our strong policy that if evidentiary rulings claimed to be improper are to be reviewed by this court, they must be set forth in the briefs as required and outlined by the rules of practice. . . . A party's mere assertion in [its] brief that the evidence was improperly excluded . . . will not be sufficient . . . ." (Internal quotation marks omitted.) *State* v. *Duteau*, 68 Conn. App. 248, 261, 791 A.2d 591, cert. denied, 260 Conn. 939, 835 A.2d 58 (2002).

spoke with Youins for the sole purpose of explaining that he could not talk to her. That limited conversation can hardly be described as a "breach of the juror's oath" because no substantial discussion of the trial or of the jury's secret deliberations took place. The defendant's reliance on *Hamilton* v. *Pease*, 38 Conn. 115 (1871), is misplaced because that case does not, as the defendant contends it does, stand for the proposition that *any* conversation between a juror and a third party is a breach of the juror's oath. Rather, *Hamilton* evinces the same doctrinal principle followed today, namely, that in a circumstance in which a juror has " 'conversed freely about the case with a person not of the jury' "; id., 117; a verdict may be set aside, but only where harm from such conduct is shown. Id., 118. This is not such a case and, therefore, we are satisfied that the court did not abuse its discretion in concluding that the defendant had suffered no prejudice from the alleged misconduct. Accordingly, we reject the defendant's claim that he is entitled to a new trial on the ground of juror misconduct.

### 2

We now turn our attention to the defendant's argument that he was entitled to a "fuller hearing" on the issue of juror misconduct. As an initial matter, we note that when a trial court is confronted with an allegation of juror misconduct, it "must conduct a preliminary inquiry, on the record . . . regardless of whether an inquiry is requested by counsel." *State* v. *Brown*, 235 Conn. 502, 526, 668 A.2d 1288 (1995) (en banc). "Although the form and scope of such an inquiry lie within a trial court's discretion . . . [t]hat form and scope may vary from a preliminary inquiry of counsel, at one end of the spectrum, to a full evidentiary hearing at the other end of the spectrum, and, of course, all points in between. Whether a preliminary inquiry of counsel, or some other limited form of proceeding, will

lead to further, more extensive, proceedings will depend on what is disclosed during the initial limited proceedings and on the exercise of the trial court's sound discretion with respect thereto." Id.

Applying those principles, we conclude that the defendant has failed to demonstrate that the inquiry conducted by the court was inadequate to safeguard his right to a trial before an impartial jury. Quite logically, the court began its investigation into the alleged misconduct by questioning the two parties involved in the allegedly improper conversation. As a result of that questioning, the court found that there was no improper conversation between the juror and Youins, and that none of the other jurors overheard their conversation. Consequently, the court appropriately determined that any inquiry of the other jurors was unnecessary. As such, we conclude that the court did not abuse its discretion by denying the motion for a mistrial on the ground that a "fuller hearing" was required.

The judgment is affirmed.

In this opinion the other judges concurred.

