GWENDOLYN FISHER *v.* ROBERT G. ZBOROWSKI
(AC 20835)

Schaller, Bishop and McLachlan, Js.

Argued January 6—officially released May 18, 2004

*Gary J. Strickland,* for the appellant (plaintiff).

*Alan L. Robertson,* for the appellee (defendant).

*Opinion*

BISHOP, J. This appeal concerns evidentiary and postverdict rulings made by the trial court in the course of a dental malpractice action tried before a jury. The plaintiff, Gwendolyn Fisher, commenced this action against the defendant, Robert G. Zborowski, an oral-maxillofacial surgeon, to recover damages for injuries she allegedly sustained as a result of the improper placement of a dental implant.[1] She appeals from the judg-

---

[1] A dental implant is a metal cylinder that is placed beneath the soft tissues and in contact with, or embedded into, the jawbone for the purpose of supporting an artificial tooth. Stedman's Medical Dictionary (25th Ed. 1990) p. 770.

ment of the court rendered after it denied her motion to set aside the jury's verdict in favor of the defendant. On appeal, the plaintiff contends that the court improperly (1) limited her direct examination of one of her expert witnesses, (2) denied her the opportunity to cross-examine adequately the defendant's expert witness and (3) denied her motion to set aside the verdict, which she claims was against the weight of the evidence. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. At the time of the trial, the plaintiff was thirty-five years old. Prior to her treatment with the defendant, she had a history of dental maladies. At age thirteen, she underwent at least three root canal procedures involving several teeth, including tooth number nineteen.[2] As part of those procedures, the contents of the affected teeth were extracted. Shortly thereafter, the plaintiff visited a hospital with complaints of dental pain. There, she was informed that areas of her mouth had become infected because the cavities of the teeth involved in the root canal procedures had not been coated with a protective substance. The plaintiff continued to see a dentist for regular cleanings until she was eighteen years old. She did not, however, see a dentist again for at least twelve years.

During that hiatus from treatment, the plaintiff noticed that her teeth, specifically her molars, had begun to "decay from the inside out and break apart and break off." She became increasingly unhappy with the condition and appearance of those teeth and, ultimately, consulted a general dentist in August, 1994. That general practitioner, in turn, referred the plaintiff to the defendant.

Accordingly, in September, 1994, the plaintiff discussed various restorative dental procedures with the

---

[2] Tooth number nineteen is the first molar in the lower left jaw.

defendant and elected a treatment plan whereby eleven of her teeth, including tooth number nineteen, would be extracted and replaced by dental implants. On November 22, 1994, the defendant performed the planned extractions. Thereafter, in preparation for placing the implants in the sites of the extracted teeth, the defendant took a panoramic X ray of the plaintiff's mouth to locate her inferior alveolar nerve, a branch of the mandibular nerve, positioned in her lower left jaw. T. Stedman, Medical Dictionary (25th Ed. 1990) p. 1039. He then placed a plastic, transparent template, which was provided by the implant manufacturer, over the X ray so that he could identify an implant length that would be long enough to have sufficient strength and durability, but short enough so as not to impinge the inferior alveolar nerve.

On April 13, 1995, the defendant performed an implant procedure during which he placed a sixteen millimeter implant in the site of extracted tooth number nineteen. A few days later, the plaintiff complained of numbness, pain and discomfort in her lower left jaw. When the plaintiff returned to see the defendant on April 21, 1995, the defendant took another panoramic X ray of her jaw. From that X ray, it appeared to him that the implant at tooth number nineteen had intersected the top line of the mandibular nerve canal. Accordingly, the defendant removed the implant on April 24, 1995. After the effects of the anesthesia from that procedure wore off, the plaintiff noticed that the pain and discomfort in her jaw had subsided. She claimed, however, that the numbness she had experienced in the lower left jaw remained. The defendant continued to treat the plaintiff until May, 1996. One month later, the plaintiff commenced an alternative treatment plan with a periodontist, David Gelb, and a dentist, Frederick Landry. That additional treatment involved extensive bridge and crown work, which

included crown lengthening procedures in the area of tooth number nineteen.

In April, 2000, the plaintiff filed an amended one count complaint against the defendant, alleging medical malpractice.[3] In turn, the defendant filed an answer, denying negligence in any of the ways alleged by the plaintiff. At trial, the jury returned a general verdict for the defendant. In a posttrial motion, the plaintiff sought to set the verdict aside and sought a new trial. The court denied the plaintiff's motion, accepted the jury's verdict and rendered judgment for the defendant. This appeal followed.

I

The plaintiff makes two evidentiary claims on appeal. She claims that the court improperly (1) refused to allow direct examination of one of her experts concerning techniques that were available in 1995 to determine an implant size that would not impinge the inferior alveolar nerve and (2) refused to permit cross-examination of the defendant's expert as to the basis of his

---

[3] The plaintiff alleged that the defendant had caused her to sustain, inter alia, "injuries of a severe and permanent nature including paresthesia and dysthesia of her lower left jaw, numbness and loss of feeling in her lower left jaw, left cheek and lower lip, difficulty chewing, headaches, and drooling out of the left side of her mouth." She specifically claimed that those injuries were caused by the defendant in "one or more the following ways: (a) IN THAT he improperly placed the implant at #19 against the nerve; (b) IN THAT he failed to accurately locate the inferior alveolar nerve prior to placing the implant; (c) IN THAT he failed to refer the plaintiff to an appropriate specialist; (d) IN THAT he failed to take appropriate radiographic studies to determine the safe and proper placement of the implant so as not to impinge said nerve; (e) IN THAT he failed to use appropriate measurements, gauges and/or devices to determine the safe and proper placement of the implant so as not to impinge the inferior alveolar nerve; (f) IN THAT he failed to timely respond to the plaintiff's complaints of pain and numbness following surgery by having her return to the office for re-examination; (g) IN THAT he failed to render timely treatment to the plaintiff following surgery, such as removing the implant, before permanent nerve injury could occur; or (h) IN THAT he used an implant that was too big."

opinion that nerve injury is a normal risk of that dental implant procedure. We address each of those arguments in turn.

A

The plaintiff's first claim is that the court improperly precluded her from questioning Gelb, one of her expert witnesses, concerning the methods of measurement the defendant could have utilized in 1995 to prevent the implant at tooth number nineteen from striking the inferior alveolar nerve. She argues that the proffered testimony would have informed the jury of the wide range of measurement alternatives that could have been employed by the defendant to prevent her injuries. She further contends that because Gelb would have testified that the use of those available means would have been consonant with the requisite standard of care, the court's exclusion of that evidence was improper and, thus, she is entitled to a new trial.

The following additional facts and procedural history are relevant to our disposition of the plaintiff's claim. At trial, Lawrence Wagenberg, a periodontist, was the first expert to testify for the plaintiff with regard to implant dentistry. During direct examination, Wagenberg was asked about the preoperative measures that were available in 1995 to prevent an implant from striking the inferior alveolar nerve during placement. The defendant's counsel objected to that line of questioning on the ground of irrelevancy, arguing, in essence, that the precautions available in 1995 to prevent that injury were irrelevant because those that satisfied the standard of care had not yet been established by the plaintiff. The court overruled the objection, stating: "I understand that, but I'm assuming that's going to be forthcoming." Wagenberg then testified that the use of computerized axial tomography (CAT) scans, diagrams, panoramic X rays, intraoperative gauges and periapical

X rays all were preoperative measures that were available in 1995 to prevent an implant from impinging the inferior alveolar nerve.

Following Wagenberg's testimony, the plaintiff called Gelb to testify. Gelb's testimony concerned, inter alia, the standard of care in 1995. During the plaintiff's direct examination of Gelb, he was asked about the range of available preoperative measures that the defendant could have employed to prevent the plaintiff's injury from occurring. The court limited Gelb's response to those preoperative measures that a physician could take *in 1995* to prevent injury to a patient's inferior alveolar nerve. Gelb then testified that the use of periapical X rays, intraoperative depth gauge measurements, millimeter rulers, cross-sectional CAT scans and shorter implants could have prevented such an injury. Gelb was not, however, permitted to give testimony concerning those preoperative measures he preferred in his practice.

The plaintiff claims on appeal that the court abused its discretion when it precluded her from exploring with Gelb the range of available preoperative measures that the defendant could have employed to prevent an impingement of her inferior alveolar nerve. We are not persuaded.

We begin our analysis of the plaintiff's claim by setting forth the well established standard by which we review the court's determinations concerning the admissibility of evidence. "[T]he trial court has wide discretion in ruling on the admissibility of expert testimony and, unless that discretion has been abused or the ruling involves a clear misconception of the law, the trial court's decision will not be disturbed." (Internal quotation marks omitted.) *State* v. *Henry*, 72 Conn. App. 640, 654, 805 A.2d 823, cert. denied, 262 Conn. 917, 811 A.2d 1293 (2002).

In the present case, the record belies the plaintiff's claim that she was not able to question Gelb about the available methods of measurement.[4] The record reveals that the plaintiff was precluded from questioning Gelb only about the preoperative methods of measurement he preferred to use in his practice in 1995. Because such testimony would not have aided the trier of fact in its determination of whether the defendant's use of panoramic X rays violated the standard of care, the court did not improperly exclude it on the ground of irrelevance. See id. (" 'A predicate to the admissibility of expert testimony is its relevance to some issue in the case. Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue.' "). Accordingly, the plaintiff's claim is unpersuasive.

B

The plaintiff next claims that she is entitled to a new trial because the court improperly denied her the opportunity to cross-examine fully the defendant's expert witness, Alfred Nemerich. Specifically, she contends that the court improperly refused to allow her to explore the basis of Nemerich's opinion that a nerve injury of the type allegedly suffered by the plaintiff could have occurred in the absence of negligence.[5] The plaintiff maintains that Nemerich's response to that question was essential to her claim that the defendant deviated from the applicable standard of care. The plaintiff argues that Nemerich would have testified that

---

[4] Our review of the record reveals that Gelb in fact was permitted to testify in that regard. See part I A.

[5] In response to a question by the plaintiff, Nemerich, an oral-maxillofacial surgeon, testified that an injury to the inferior alveolar nerve was a well known risk of a dental implant procedure. The plaintiff sought to challenge that testimony by exploring the basis for Nemerich's opinion. She specifically sought to ask Nemerich if he believed that this type of nerve injury occurs in the absence of negligence and, if so, how he came to form that opinion. The court, however, refused to allow that line of questioning.

he did not know whether the nerve injuries he had seen and on which he had relied to form the opinion at issue were the result of deviations from the standard of care or simply were normal consequences of the procedure.[6] The plaintiff further contends that without that explanation, "the jury was left with the impression that permanent nerve injury was simply a normal consequence of the implant procedure, one that commonly occurs without negligence on the part of the doctor" and, thus, the jury "would be justified in not holding the defendant liable in this case." Because we conclude that the plaintiff has failed to demonstrate the likelihood that the testimony at issue would have changed the outcome of the trial, we need not review the propriety of the court's evidentiary ruling.

[6] The following exchange, in relevant part, occurred during the plaintiff's voir dire of Nemerich:

"[The Plaintiff's Counsel]: The question is, doctor, how much permanent nerve injuries have you seen in the nature that [the plaintiff] has?

"[The Witness]: I don't know.

"[The Plaintiff's Counsel]: And in any one of those, have you investigated, or were they a maloccurrence opposed to the result of a deviation from a standard of care?

"[The Witness]: None before this, no.

"[The Plaintiff's Counsel]: So, you have no basis on which to say that injuries of this nature are a normal risk of the procedure that can happen in the absence of negligence, do you?

"[The Witness]: Well, yes I do.

"[The Plaintiff's Counsel]: From past experience, you're saying?

"[The Witness]: You have—it's certainly very possible to have this type of injury without any malpractice or negligence.

"[The Plaintiff's Counsel]: But you have never seen one, correct?

"[The Witness]: No, I didn't say that. You asked me if I ever investigated them. I never investigated patients that have been referred to me, and I think we discussed this at the deposition, personally referred to me. This is a combination of a problem, and you want me to solve it, and I'm not going to go back and, you know, and do due diligence as such as we've done here.

"[The Plaintiff's Counsel]: Not asking for an explanation of why you don't know, but the point is you do not know whether the nerve injuries that you have seen were the result of a deviation of the standard of care or not because you haven't investigated it, correct?

"[The Witness]: Well, that's true."

"[Our Supreme Court has] often stated that before a party is entitled to a new trial because of an erroneous evidentiary ruling, he or she has the burden of demonstrating that the error was harmful. . . . When determining that issue in a civil case, the standard to be used is whether the erroneous ruling would likely affect the result [of the trial]." (Internal quotation marks omitted.) *Ludington* v. *Sayers*, 64 Conn. App. 768, 778, 778 A.2d 262 (2001). Thus, the determinative question is whether, had the jury been presented with the testimony at issue, it likely would have returned a different verdict. Our close inspection of the record leads us to answer that question in the negative.

It is axiomatic that in a medical negligence action, the plaintiff must prove "(1) the requisite standard of care for treatment, (2) a deviation from that standard of care, and (3) a causal connection between the deviation and the claimed injury." (Internal quotation marks omitted.) *Carusillo* v. *Associated Women's Health Specialists, P.C.*, 79 Conn. App. 649, 654, 831 A.2d 255 (2003). In the present case, even if we assume arguendo that the testimony at issue was relevant to the plaintiff's claim that the defendant deviated from the applicable standard of care, it did not bear on the question of causation. Regarding causation, we note that the jury was presented with conflicting evidence. Although the jury heard testimony that, if credited, would have been sufficient to establish the required causal connection, the jury also had ample evidence that rebutted that connection. That evidence included testimony that the plaintiff had a history of poor dental health and lack of treatment, that the dental procedures the plaintiff underwent after those performed by the defendant could have led to an injury that exhibited symptoms similar to those allegedly suffered by the plaintiff and testimony that some of the plaintiff's alleged injuries would not logically stem from an impingement of the

inferior alveolar nerve.[7] Thus, even if the plaintiff had been able to erode the defendant's claim that her alleged injury did not arise from his negligence, the jury still reasonably could have returned a verdict in favor of the defendant on the basis of a lack of causation. We conclude, therefore, that the court's ruling regarding the plaintiff's cross-examination of Nemerich was not likely to affect the trial's outcome. As such, that claim, too, must fail.

## II

The plaintiff's final claim is that the court improperly denied her motion to set aside the verdict because the verdict in favor of the defendant was against the weight of the evidence. We disagree.

We begin by noting that "we review the court's denial of a motion to set aside the verdict under an abuse of discretion standard. The court is vested with wide discretion in such matters, and we will not disturb the court's decision unless it has abused that discretion. . . . Generally, the court should not set aside a verdict where the jury reasonably could have found as it did from the evidence before it. The court's refusal to set aside a verdict is entitled to great weight, and every reasonable presumption should be indulged in favor of its correctness. . . . On appeal, the evidence in the record is to be considered in a light most favorable to the parties who prevailed at trial." (Citations omitted; internal quotation marks omitted.) *Mojica* v. *Benjamin*, 64 Conn. App. 359, 361–62, 780 A.2d 201 (2001).

[7] Specifically, the jury heard testimony indicating that (1) the plaintiff's childhood dentist had "butchered" her teeth, (2) nerve damage could result from crown lengthening procedures, (3) shooting pain could result from crown work, (4) drooling and shooting pain do not result from an injury to the inferior alveolar nerve, (5) the plaintiff had reported to Gelb that she experienced pain in her lower jaw, not numbness and (6) the first time the plaintiff experienced shooting pain was after she was fitted for a bridge.

Our review of the record discloses that there was ample evidence in support of the jury's verdict. As noted, the jury heard testimony challenging the causal connection between the alleged negligence of the defendant and the plaintiff's alleged injuries. In light of that testimony, we conclude that a reasonable jury, in determining the facts and inferences that reasonably could be drawn from them, could have found that the defendant's actions did not cause the symptoms that the plaintiff attributed to the defendant's placement of the implant. Because there was sufficient evidence to support the jury's verdict in favor of the defendant, we further conclude that the court did not abuse its discretion in denying the plaintiff's motion to set it aside. As a consequence, the plaintiff's final claim also is unavailing.

The judgment is affirmed.

In this opinion the other judges concurred.